# 25-2732

*To Be Argued By*:
TARA SCHWARTZ

# United States Court of Appeals
## FOR THE SECOND CIRCUIT
### Docket No. 25-2732

◄••►

HAIYAN CHEN, individually, and on behalf of all similarly situated, KENYA WATSON, individually, and on behalf of all similarly situated, S.O., individually, and on behalf of all similarly situated, GERTRUDE CRIBBS, individually, and on behalf of all similarly situated, HANA BROOME, individually, and on behalf of all similarly situated, MEI IENG LEE, individually, and on behalf of all similarly situated,

*Plaintiffs-Appellants,*

—v.—

BROOKE L. ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture (USDA), JAMES C. MILLER, in his official capacity as Acting Administrator of the USDA Food and Nutrition Service,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

JAY CLAYTON,
*United States Attorney for the Southern District of New York, Attorney for Defendants-Appellees.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2633

TARA SCHWARTZ,
BENJAMIN H. TORRANCE,
*Assistant United States Attorneys,*
*Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  2

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . .  3

Issues Presented for Review . . . . . . . . . . . . . . . . . . .  3

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . .  4

    A.  Procedural History . . . . . . . . . . . . . . . . . . . .  4

    B.  Factual Background . . . . . . . . . . . . . . . . . . .  4

        1.  Benefits Replacement Under the
Paper Coupon System . . . . . . . . . . . . . .  4

        2.  Benefits Replacement Under the
EBT System . . . . . . . . . . . . . . . . . . . . . .  7

        3.  EBT Cards and Skimming . . . . . . . . .  10

    C.  The District Court's Opinion . . . . . . . . . . .  11

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . .  15

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Standards of Review . . . . . . . . . . . . . . . . . . . . . . . .  17

POINT I—The 2010 Regulation Is Not
Contrary to Law. . . . . . . . . . . . . . . . . . . . . . . . .  18

    A.  The Administrative Procedure Act . . . . . .  18

    B.  The SNAP Statutory Framework Does
Not Authorize Replacement of Benefits
Stolen After Receipt . . . . . . . . . . . . . . . . .  19

ii

PAGE

C. The 2010 Regulation is "Similar" to the
Regulations Governing the Paper
Coupon Regime . . . . . . . . . . . . . . . . . . . . . . 22

    1. The Regulation Comports with the
       Plain, Ordinary Meaning of the
       Statute . . . . . . . . . . . . . . . . . . . . . . . . 22

    2. Section 2016(h)(7) Does Not Require
       the USDA to Replicate the "Why" and
       "How" of the Paper Coupon Regime . . 25

    3. Plaintiffs' Argument About
       Similarity Is Not Rooted in the
       Statutory Scheme. . . . . . . . . . . . . . . . 28

POINT II—The 2010 Regulation Is Not
Arbitrary and Capricious . . . . . . . . . . . . . . . . . 30

A. The USDA Properly Considered the
Pertinent Issues . . . . . . . . . . . . . . . . . . . . . 30

B. The District Court Did Not Abuse Its
Discretion in Declining to Consider
Plaintiffs' Extra-Record Evidence
Regarding Skimming . . . . . . . . . . . . . . . . . 34

C. The USDA Engaged in Reasoned
Decisionmaking. . . . . . . . . . . . . . . . . . . . . . 38

POINT III—The District Court Properly Held
There Is No Separate 2022 Policy
Subject to APA Review . . . . . . . . . . . . . . . . . . 40

iii

PAGE

A.  Plaintiffs Failed to Plead a 2022
    Policy in the Complaint . . . . . . . . . . . . . . .  40

B.  The District Court Correctly Held
    That the 2022 Policy Does Not
    Constitute Final Agency Action. . . . . . . . .  43

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

iv

# TABLE OF AUTHORITIES

*Cases*:

*American Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008). . . . . . . . . . . . . . . . 36

*Automotive Parts & Accessories Ass'n v. Boyd*,
  407 F.2d 330 (D.C. Cir. 1968). . . . . . . . . . . . . . . 39

*Bennett v. Spear*,
  520 U.S. 154 (1997). . . . . . . . . . . . . . . . . . . . . 44, 46

*Biden v. Texas*,
  597 U.S. 785 (2022). . . . . . . . . . . . . . . . . . . . . 35, 36

*Calcutt v. FDIC*,
  598 U.S. 623 (2023). . . . . . . . . . . . . . . . . . . . . . 35

*Camp v. Pitts*,
  411 U.S. 138 (1973). . . . . . . . . . . . . . . . . . . . . 35, 36

*Center for Auto Safety v. Peck*,
  751 F.2d 1336 (D.C. Cir. 1985). . . . . . . . . . . . . . 39

*Commodity Futures Trading Comm'n v. Schor*,
  478 U.S. 833 (1986). . . . . . . . . . . . . . . . . . . . . . 21

*Daniel v. American Board of Emergency Medicine*,
  428 F.3d 408 (2d Cir. 2005) . . . . . . . . . . . . . . . . 22

*Environmental Defense v. EPA*,
  369 F.3d 193 (2d Cir. 2004) . . . . . . . . . . . . . . . . 30

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021). . . . . . . . . . . . . . 18, 30, 38, 40

v

PAGE

*Florida Power & Light Co. v. Lorion,*
　　470 U.S. 729 (1985). . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Fund for Animals, Inc. v. U.S. Bureau of Land
　　Management,*
　　460 F.3d 13 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . 45

*Golden & Zimmerman, LLC v. Domenech,*
　　599 F.3d 426 (4th Cir. 2010) . . . . . . . . . . . . . . . . 46

*Greenidge v. Allstate Insurance Co.,*
　　446 F.3d 356 (2d Cir. 2006) . . . . . . . . . . . . . . 40, 41

*Her Majesty the Queen in Right of Ontario v. EPA,*
　　912 F.2d 1525 (D.C. Cir. 1990). . . . . . . . . . . . . . 43

*Hill Dermaceuticals, Inc. v. FDA,*
　　709 F.3d 44 (D.C. Cir. 2013). . . . . . . . . . . . . . . . 18

*Hu v. City of New York,*
　　927 F.3d 81 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 26

*Independent Equipment Dealers Ass'n v. EPA,*
　　372 F.3d 420 (D.C. Cir. 2004). . . . . . . . . . . . . . . 46

*Islander East Pipeline Co., LLC v. McCarthy,*
　　525 F.3d 141 (2d Cir. 2008) . . . . . . . . . . . . . . . . 31

*Kakar v. USCIS,*
　　29 F.4th 129 (2d Cir. 2022) . . . . . . . . . . . . . . . . 18

*Karpova v. Snow,*
　　497 F.3d 262 (2d Cir. 2007) . . . . . . . . . . . . . . . . 17

*Lujan v. National Wildlife Federation,*
　　497 U.S. 871 (1990). . . . . . . . . . . . . . . . . . . . . 44, 45

vi

PAGE

*Mobil Cerro Negro, Ltd. v. Bolivarian*
  *Republic of Venezuela,*
  863 F.3d 96 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . 21

*Motor Vehicle Mfrs. Ass'n v. State Farm*
  *Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983). . . . . . . . . . . . . . . . . .  18, 19, 38

*National Audubon Society v. Hoffman,*
  132 F.3d 7 (2d Cir. 1997) . . . . . . . . . . . . . . . . 35, 36

*New York v. DOJ,*
  951 F.3d 84 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . 31

*New York State Rifle & Pistol Ass'n v. Bruen*
  597 U.S. 1 (2022). . . . . . . . . . . . . . . . . . .  25, 26, 27

*NLRB v. Bell Aerospace Co.,*
  416 U.S. 267 (1974). . . . . . . . . . . . . . . . . . . . . . . 21

*Northcross v. Board of Education of*
  *Memphis City Schools,*
  412 U.S. 427 (1973). . . . . . . . . . . . . . . . . . . . . . . 26

*Norton v. South Utah Wilderness Alliance,*
  542 U.S. 55 (2004). . . . . . . . . . . . . . . . . . . . . . . 44

*NRDC v. EPA,*
  658 F.3d 200 (2d Cir. 2011) . . . . . . . . . . . . . . . . 19

*Ortega v. Johnson,*
  57 Cal. App. 5th 552 (Cal. App. 2020). . . . . . . . . 20

*Patterson v. Caterpillar, Inc.,*
  70 F.3d 503 (7th Cir. 1995) . . . . . . . . . . . . . . . . 31

vii

PAGE

*Safe Haven Home Care, Inc. v. HHS,*
130 F.4th 305 (2d Cir. 2025) . . . . . . . . . . . . . . . . 30

*Theodore Roosevelt Conservation
Partnership v. Salazar,*
616 F.3d 497 (D.C. Cir. 2010). . . . . . . . . . . . . . . 18

*U.S. Army Corps of Engineers v. Hawkes Co.,*
578 U.S. 590 (2016). . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Daniels,*
124 F.4th 967 (5th Cir. 2025). . . . . . . . . . . . . . . . 26

*United States v. Dauray,*
215 F.3d 257 (2d Cir. 2000) . . . . . . . . . . . . . . . . 22

*USPS v. Konan,*
146 S. Ct. 736 (2026). . . . . . . . . . . . . . . . . . . . . . . 22

*Wynder v. McMahon,*
360 F.3d 73 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 17

*Statutes*:

5 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

5 U.S.C. § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 35

7 U.S.C. § 2016 . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

viii

PAGE

*Regulations*:

7 C.F.R. § 274.6 . . . . . . . . . . . . . . . . . . . . . . . 9, 24, 29

7 C.F.R. § 276.2 . . . . . . . . . . . . . . . . . . . . . . . . . 8, 25

*Other Authorities*:

46 Fed. Reg. 8935 (Jan. 27, 1981) . . . . . . . . . . . . . . . 5

46 Fed. Reg. 50,277 (Oct. 9, 1981). . . . . . . . . . . . . . . 6

56 Fed. Reg. 65,114 (Dec. 13, 1991) . . . . . . . . . . . 7, 29

75 Fed. Reg. 18,377 (Apr. 12, 2010) . . . . . . . . . . . . . 9

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 25-2732

———————

HAIYAN CHEN, INDIVIDUALLY, AND ON BEHALF OF ALL SIMILARLY SITUATED, KENYA WATSON, INDIVIDUALLY, AND ON BEHALF OF ALL SIMILARLY SITUATED, S.O., INDIVIDUALLY, AND ON BEHALF OF ALL SIMILARLY SITUATED, GERTRUDE CRIBBS, INDIVIDUALLY, AND ON BEHALF OF ALL SIMILARLY SITUATED, HANA BROOME, INDIVIDUALLY, AND ON BEHALF OF ALL SIMILARLY SITUATED, MEI IENG LEE, INDIVIDUALLY, AND ON BEHALF OF ALL SIMILARLY SITUATED,

*Plaintiffs-Appellants,*

—v.—

BROOKE L. ROLLINS, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF AGRICULTURE (USDA), JAMES C. MILLER, IN HIS OFFICIAL CAPACITY AS ACTING ADMINISTRATOR OF THE USDA FOOD AND NUTRITION SERVICE,

*Defendants-Appellees.*

———————

## BRIEF FOR DEFENDANTS-APPELLEES

———————

2

## Preliminary Statement

For over half a century, Congress has provided food assistance to low-income families—initially, in the form of "food stamps"; in more recent years, through electronic benefit transfers ("EBT"). But throughout the program's existence, the governing statutes and regulations have never allowed for the use of federal funds to replace benefits stolen after program participants received them. That reflects a clear line drawn by Congress and the United States Department of Agriculture ("USDA"): benefits lost or stolen after receipt are the responsibility of the recipient or the administering state—not the federal government. That principle governed the old paper coupon system and remains embedded in the statutory framework governing electronic benefits.

Plaintiffs in this case challenge that concept as it applies to the "skimming" of benefits—a form of theft in which a card-reading device is illicitly used to capture the information from a participant's EBT card, which is then utilized to steal from the user's account —and seek to require the federal government to replace benefits stolen in that manner. But as the district court correctly held, that relief is barred by the USDA's current regulation, as well as by the statute underlying the food assistance program. The regulation, adopted in 2010 (the "2010 Regulation"), provides for replacement of lost or stolen benefit cards, or replacement of stolen benefits in certain circumstances, but, following the longstanding practice mandated by statute, does not permit replacement of benefits once

3

they have been issued to the program participant, including in cases of skimming.

For much the same reasons, the USDA's regulation is also consistent with Congress's directive that regulations governing electronic benefits be "similar" to the regulations that applied to the paper-based regime. Under both, benefits lost or stolen after they were issued to the program participant would not be replaced by the USDA; the 2010 Regulation is therefore "similar" to its paper-based predecessors in the most relevant respects. The record shows that the USDA thoroughly considered issues of electronic security, and its decisions were both reasonable and reasonably explained. Because plaintiffs fail to identify any legal error in the district court's reasoning upholding the USDA's regulation, the court's judgment should be affirmed.

## Jurisdictional Statement

The district court had subject matter jurisdiction over this action under 28 U.S.C. § 1331 because plaintiffs' claims arose under the laws of the United States. The district court entered final judgment dismissing plaintiffs' action on August 28, 2025 (Special Appendix ("SPA") 23), and plaintiffs filed a timely notice of appeal on October 27, 2025 (Joint Appendix ("JA") 836). Accordingly, this Court has jurisdiction under 28 U.S.C. § 1291.

## Issues Presented for Review

1. Whether the USDA's 2010 Regulation is consistent with the governing statutes.

4

2. Whether the USDA properly addressed the relevant considerations in adopting the 2010 Regulation.

3. Whether the district court correctly held that plaintiffs had not pleaded the existence of a supposed 2022 policy, and correctly held that if such a policy had been pleaded it does not constitute final agency action subject to APA review.

## Statement of the Case

### A. Procedural History

Plaintiffs commenced this action in district court against the USDA on February 22, 2023. (JA 19). The USDA filed the administrative record on September 4, 2024. (JA 69-511). On December 18, 2024, plaintiffs moved for summary judgment (JA 512), and on March 17, 2025, the USDA cross-moved for summary judgment (JA 801). On August 28, 2025, the district court granted the USDA's motion for summary judgment and denied plaintiffs' motion for summary judgment. (SPA 1-22). The court entered judgment the same day. (SPA 23). Plaintiffs filed a notice of appeal on October 27, 2025. (JA 836).

### B. Factual Background

#### 1. Benefits Replacement Under the Paper Coupon System

The Food Stamp Act of 1964 established a "food stamp program" to "permit those households with low incomes to receive a greater share of the Nation's food abundance." (JA 71). Under the program, eligible households received coupons with which to purchase

5

food from retail stores. (JA 72). The program was not nationwide; states decided whether to participate and were responsible for, among other things, issuing coupons to eligible households. (JA 74-75). Thus, although the food stamp program was federally funded, state agencies were responsible for administering the program in each state consistent with federal law. (JA 71-77).

The Food and Agriculture Act of 1977 amended the Food Stamp Act of 1964 to create the Food Stamp Act of 1977. (JA 78-106). Among its amendments, the 1977 Act provided that "[n]otwithstanding any other provision of this Act, the State agency [administering the food stamp program] shall be responsible to the [Agriculture] Secretary for any financial losses involved in the acceptance, storage, and issuance of coupons." (JA 93).

In January 1981, the USDA's Food and Nutrition Service ("FNS") issued a proposed rule that sought to "minimize[e] possibilities for fraud and error in the Food Stamp Program" by, among other things, "authoriz[ing] the replacement of lost, stolen, or destroyed . . . coupons within limits that restrict opportunities for fraud and abuse." (JA 107); 46 Fed. Reg. 8935, 8935 (Jan. 27, 1981). To that end, the proposed rule allowed for replacement of coupons lost prior to receipt due to the "nondelivery of mail," but provided that "a household [is] entitled to receive only one replacement in any 6 month period for . . . coupons destroyed or stolen subsequent to receipt." (JA 108).

The final rule adopted by FNS in October 1981 did not include the provision allowing for replacement of

6

any coupons destroyed or stolen following receipt. In explaining this decision, FNS noted that "[t]he concept of replacing welfare benefits which have been lost or stolen after they have been received by the participant [is] not common in Federal assistance programs." (JA 114); 46 Fed. Reg. 50,277, 50,278 (Oct. 9, 1981). Accordingly, "[t]he Department agreed with commenters [on the January 1981 proposed rule] that a recipient should be responsible for coupons once the recipient has the coupons." (JA 114). FNS referred to another benefits program that permitted replacement of stolen checks but not cash stolen from recipients after they had cashed the checks, reasoning that "[w]hen a check is cashed the money becomes the recipient's responsibility." (JA 114).

FNS acknowledged "that this will cause a hardship for those participants whose coupons really are stolen." (JA 114). But it "believe[d] that not allowing the replacement of coupons stolen after receipt is necessary because of the need to better control program accountability in this area." (JA 114).

Two months later, Congress passed the Agriculture and Food Act of 1981. This Act amended section 7(f) of the Food Stamp Act—the provision holding states responsible for losses relating to coupons—by substituting stronger language: "the State agency shall be *strictly liable* to the Secretary for any financial losses involved in the acceptance, storage and issuance of coupons." (JA 131 (emphasis added)).

7

### 2. Benefits Replacement Under the EBT System

The Mickey Leland Memorial Domestic Hunger Relief Act of 1990 enacted a significant change to what, since 1964, had been the food "stamp" program: it permitted states, "with the approval of the Secretary," to "implement an on-line electronic benefit transfer ['EBT'] system in which household benefits . . . are issued from and stored in a central data bank and electronically accessed by household members at the point-of-sale." (JA 162). The Act also provided "for emergency allotments to eligible households to replace food destroyed in a disaster." (JA 159). Specifically, the Act directed that "the regulations shall provide for replacement of the value of food actually lost up to a limit approved by the Secretary not greater than the applicable maximum monthly allotment for the household size." (JA 159).

In response to the Mickey Leland Act, FNS began to promulgate regulations governing the EBT system. In a December 1991 proposed rule, FNS specifically addressed liability for replacement benefits under the EBT system at a time when the EBT and paper coupon systems were simultaneously operational. (JA 207); 56 Fed. Reg. 65,114 (Dec. 13, 1991). In the "State Liabilities" section, the proposed rule explained that "[t]he State agency remains responsible for issuance losses in an EBT system the same as it is in a coupon issuance system. The Department has no authority to pay for . . . lost or stolen benefits after a household receives them." (JA 207). A final rule embodying this position on state liability was adopted in April 1992 (as

8

corrected in September 1992), codifying at 7 C.F.R. § 276.2(b)(7) that "replacement benefits [issued] to a household's account due to unauthorized use of the benefits in a household's account" constitute over-issuances for which the states are strictly liable. (JA 217).

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA") affected the program in two respects. First, it exempted the EBT system from the Electronic Funds Transfer Act ("EFTA"), which assigns responsibilities and liabilities to debit and credit card issuers when the cardholder is victimized by fraud. (JA 305). In doing so, Congress clarified that it did not intend for the federal government to be responsible or liable under the EFTA for the theft of EBT benefits. Congress also specified in PRWORA that any "[r]egulations issued by the Secretary regarding the replacement of benefits and liability for replacement benefits under an electronic benefit transfer system shall be similar to the regulations in effect for a paper-based food stamp issuance system." (JA 283).

Congress passed the Food and Nutrition Act in 2008. (JA 306-480). This legislation renamed the Food Stamp Act the Food and Nutrition Act, and it modernized the program, renaming it the Supplemental Nutrition Assistance Program ("SNAP"). The language of the Act (as now codified) tracks the strict-liability language introduced in 1981: "Notwithstanding any other provision of this chapter, the State agency shall be strictly liable to the Secretary for any financial losses involved in the acceptance, storage and issuance of benefits," with an exception for "losses resulting

9

from the issuance and replacement of authorizations for benefits which are sent through the mail." (JA 357); 7 U.S.C. § 2016(e). Echoing the language introduced by PWRORA in 1996, the Act also provides that "[r]egulations issued by the Secretary regarding the replacement of benefits under an electronic benefit transfer system shall be similar to the regulations in effect for a paper-based supplemental nutrition assistance issuance system." (JA 361); 7 U.S.C. § 2016(h)(7).

In April 2010, FNS issued a direct final rule, which made "changes to the SNAP regulations . . . to account for the replacement of the paper coupon issuance system with the Electronic Benefits Transfer (EBT) system as the nationwide method of distributing benefits to program recipients." (JA 481 (noting that " 'the 2008 Farm Bill' . . . prohibits State agencies from issuing paper food stamp coupons and makes EBT cards the sole method of benefit delivery")); 75 Fed. Reg. 18,377, 18,377 (Apr. 12, 2010). That direct final rule was adopted as a final rule, without change, in December 2010. (JA 498). As a result of this final rule, the USDA adopted 7 C.F.R. § 274.6—the 2010 regulation at issue in this case—which allows "replacement issuances" for "food purchased with Program benefits [that] was destroyed in a household misfortune," 7 C.F.R. § 274.6(a)(1), and replacement of EBT cards that are "lost, stolen or damaged," 7 C.F.R. § 274.6(b), but which does not provide for the replacement of benefits that are stolen, for example through skimming.

In its 2023 Consolidated Appropriations Act, Congress allowed for limited replacement of benefits skimmed during two specified fiscal years. It

10

permitted states to use federal funds "to replace benefits that are determined by the State agency to have been stolen through card skimming" "during the period beginning on October 1, 2022, and ending on September 30, 2024." (JA 503-04). Congress specified that these replacement benefits "shall not be regarded as losses for the purpose of section 7(e) of the Food and Nutrition Act of 2008 (7 U.S.C. 2016(e))" (JA 504), the provision of the Act that holds states "strictly liable for financial losses involved in the . . . issuance of benefits," 7 U.S.C. § 2016(e).

### 3.  EBT Cards and Skimming

In New York, the SNAP program is administered by the Office of Temporary and Disability Assistance ("OTDA"). (JA 24). OTDA issues SNAP benefits to program participants' EBT accounts once per month, usually on the same day every month. (JA 24). SNAP participants can then use the benefits on their EBT cards to purchase food throughout the month. (JA 24).

Skimming occurs when perpetrators install a card-reading device at a point-of-sale device to capture a consumer's credit or debit card number, account information, and personal identification number. (JA 20). Perpetrators then use this information to create a counterfeit "dummy" card and steal from the unsuspecting victim's account. (JA 20). In the context of EBT, skimming involves the theft of benefits already in a SNAP participant's account, and therefore, benefits that have already been received by the participant, even if those benefits have not yet been redeemed.

11

## C.   The District Court's Opinion

On August 28, 2025, the district court issued an opinion and order granting the USDA's motion for summary judgment and denying plaintiffs' motion for summary judgment. (SPA 1-22). In evaluating plaintiffs' motion, the court first considered plaintiffs' submission of various materials outside of the administrative record. (SPA 8-11). The court noted that plaintiffs proffered extra-record evidence for three purposes: to show that the USDA failed to consider the problem of skimming when it promulgated the challenged agency actions; to establish plaintiffs' standing; and to show that the USDA adopted the "2022 Policy." (SPA 8). The court declined to consider the extra-record evidence for either of the first two purposes, but did consider the extra-record evidence for the third. (SPA 8-11).[1]

The court rejected plaintiffs' attempt to offer extra-record evidence to show that the USDA failed to consider the threat of skimming when it implemented the challenged agency actions. (SPA 9-11). In light of this Court's pronouncements concerning the limited circumstances in which the admission of extra-record evidence in an APA case is appropriate, the district court first considered whether disregarding such evidence would leave the court without an adequate understanding of what information is important in the

---

[1]   The district court declined to consider plaintiffs' evidence on standing because the USDA conceded plaintiffs' standing had been adequately alleged in the complaint. (SPA 11).

12

field in which the agency decision was made. (SPA 9). Here, plaintiffs' extra-record evidence did not identify a sufficiently important problem of an entirely new general subject matter that the USDA failed to consider. (SPA 9-10). Rather, the administrative record made clear that the USDA considered theft and security of EBT cards in implementing the challenged policy. (SPA 10). The USDA required state agencies to permit households to select personal identification numbers ("PINs") for their EBT cards; develop systems to verify PINs at issuance terminals or at the point of sale and to ensure EBT systems met performance and technical standards for system security; replace lost or stolen EBT cards; place an immediate hold on accounts as soon as notice regarding the need for card or PIN replacement was received; and assume liability for benefits drawn from an EBT account and to replace benefits stolen after fraud was reported for households who had reported their EBT card stolen. (SPA 10-11). The USDA regulations also outlined detailed measures to protect the transmission of transaction data and issuance of information from point-of-sale terminals to data processing centers. (SPA 10-11). Given that the extra-record evidence pointed to one permutation of theft arising from a gap in security, rather than pointing to an entirely new general subject matter that the USDA ignored, the district court declined to consider the extra-record evidence pertaining to the prevalence and incidence of skimming. (SPA 11).

With respect to the extra-record evidence concerning the adoption of a 2022 policy, the court concluded it was bound to consider it, otherwise it would be

13

impossible to assess whether such policy existed separate from the 2010 Regulation and whether the policy constituted final agency action. (SPA 11).

The court then considered the merits of plaintiffs' APA challenges and concluded that the 2010 Regulation was not contrary to law or arbitrary and capricious. (SPA 12-17). The court noted that Congress required that any regulation issued by the USDA "regarding the replacement of benefits and liability for replacement of benefits under" the EBT system " 'be similar to the regulations in effect for a paper-based supplemental nutrition assistance issuance system.' " (SPA 12 (quoting 7 U.S.C. § 2016(h)(7))). By imposing a similarity requirement, Congress indicated that it intended the USDA's regulations governing the EBT system to be "alike in substance or essentials" to the prior regime governing the coupon system, sharing enough "characteristics in common" to be "very much alike," but not necessarily "identical." (SPA 13). The court found that the 2010 Regulation shared the same essential characteristics as the coupon-based replacement regime, and thus the 2010 Regulation was in accordance with law. (SPA 14). The district court reasoned that the USDA policy always drew lines to strike a balance between replacing benefits for households experiencing losses with the need to deter fraud and abuse and encourage program accountability. (SPA 14-15). Further, the court observed that the USDA had always recognized that this line-drawing would cause some amount of hardship for participants whose benefits really were stolen. (SPA 15). The court noted that because the 2010 Regulation allowed for the replacement of lost or stolen EBT cards, and similarly

14

balanced the risk of fraud and abuse with a hardship imposed on those whose coupons were stolen, it was "similar" to the regulations governing the coupon-based system, and therefore not contrary to law. (SPA 15).

The court also concluded that the 2010 Regulation was not arbitrary and capricious on the ground that the USDA failed to consider the problem of skimming. (SPA 15). The court noted that although the USDA did not address skimming specifically when adopting the 2010 Regulation, it did focus on the theft of EBT cards and the security of the EBT system. (SPA 16). The court reasoned that where the agency implemented detailed regulations on the general subject matter at issue—namely, measures to replace stolen EBT cards and to address data security—it would be improvident to take the agency to task for not addressing skimming, which was not raised to it during the rulemaking process. (SPA 16-17). Thus, the court held that plaintiffs failed to show that the USDA engaged in something other than reasoned decisionmaking when adopting the 2010 Regulation. (SPA 17).

Finally, the district court turned to plaintiffs' arguments regarding the "2022 Policy." (SPA 17). First, the district court noted that plaintiffs struggled to define clearly what agency actions constituted the 2022 policy. (SPA 17). The court explained that plaintiffs pointed to the existence of an amalgamation of state and federal agency documents which they contended evinced the existence of the USDA's "policy prohibiting replacement of skimmed SNAP benefits with federal funds." (SPA 17). But the court held that the

15

allegations regarding the 2022 policy were not timely pleaded. (SPA 18). While certain of the state and federal agency documents were cited in the complaint for background information on skimming or to reinforce the alleged unlawfulness of the 2010 Regulation, "[n]othing in the [c]omplaint . . . asserts the existence of a 2022 Policy or even implies that the cited 2022 and 2023 agency documents constitute a cohesive policy." (SPA 19). Further, the court held that, even if it were to conclude that a 2022 policy was timely pleaded, it would not be subject to challenge under the APA because it does not constitute final agency action. (SPA 20). Plaintiffs' reliance on documents or actions taken by state agencies could not evidence a federal policy, and the federal government documents that plaintiffs relied on did not provide any definitive statement on the USDA's position on reimbursements for benefits lost to skimming. (SPA 20-21). Accordingly, the court held that the only actionable measure regarding the USDA's policy prohibiting the replacement of skimmed SNAP benefits with federal funds is the 2010 Regulation, which does not violate the APA. (SPA 22).

This appeal followed.

## Summary of Argument

The district court correctly upheld the USDA's regulation against plaintiffs' challenge. The Food and Nutrition Act generally does not authorize the use of federal funds to replace stolen SNAP benefits after they have been received by program participants, and the USDA's regulation is consistent with that statutory

16

command. Congress has long imposed strict liability on state agencies for losses associated with the issuance of benefits, and for the most part has never authorized the use of federal funds to replace benefits stolen after receipt. That principle has been reflected in numerous iterations of the statutes governing the food assistance program; indeed, when Congress created a time-limited authorization for replacing skimmed benefits in 2023, its action confirmed its baseline understanding that such replacement is not otherwise allowed. *See infra* Point I.B. Moreover, Congress directed the USDA to ensure its EBT regulations are "similar" to those governing the paper coupon system. Both regimes draw the same fundamental line: benefits lost before receipt may be replaced in limited circumstances, but benefits lost after receipt are not. Plaintiffs' attempt to impose a requirement that the two systems mirror each other in purpose and mechanism relies on inapposite case law and ignores the statutory context. Nor is plaintiffs' theory that "control" of benefits is the governing principle supported by the statutory scheme. *See infra* Point I.C.

The district court also correctly found no merit to plaintiffs' argument that the 2010 Regulation was arbitrary and capricious. The USDA reasonably adhered to longstanding policy choices governing benefit replacement and considered the relevant issues, including system security and risks of unauthorized access. The APA does not require the agency to anticipate or separately analyze every evolving form of fraud, including skimming, nor does it require reconsideration of a settled policy each time new technological risks emerge. *See infra* Point II.A. The district court

17

properly held that plaintiffs' assertion that the USDA did not consider certain issues is insufficient to permit plaintiffs to introduce extra-record evidence in this regard. *See infra* Point II.B. And it correctly concluded that the agency reasonably explained its actions in adopting the Regulation. *See infra* Point II.C.

Finally, plaintiffs' "2022 Policy" theory independently fails. The complaint does not identify any such policy as a discrete agency action. *See infra* Point III.A. In any event, the materials plaintiffs cite do not establish final agency action that could be reviewable under the APA, but instead reflect the application of existing law or statements by third parties. *See infra* Point III.B.

Because plaintiffs have not identified any legal error in the district court's thorough and well-reasoned opinion, the judgment should be affirmed.

## A R G U M E N T

### Standards of Review

"On appeal from a grant of summary judgment involving a claim brought under the Administrative Procedure Act, [this Court] review[s] the administrative record *de novo* without according deference to the decision of the district court." *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007). This Court reviews the district court's holding that the alleged 2022 policy was not timely pleaded and the district court's decision to exclude extra-record evidence for abuse of discretion. *Wynder v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004)

18

(appellate courts review "dismissals for failure to comply with Rule 8(a)" for "abuse of discretion"); *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) (applying abuse-of-discretion standard to decision regarding admission of extra-record evidence in APA case); *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (same).

## POINT I

### The 2010 Regulation Is Not Contrary to Law

### A. The Administrative Procedure Act

The APA permits courts to "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The reviewing court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, judicial review under the APA "is narrow and deferential, and limited to examining the administrative record to determine whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Kakar v. USCIS*, 29 F.4th 129, 132 (2d Cir. 2022) (citations and quotation marks omitted). Agency action may be set aside as arbitrary and capricious only where " 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its

19

decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *NRDC v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting *State Farm*, 463 U.S. at 43).

### B.   The SNAP Statutory Framework Does Not Authorize Replacement of Benefits Stolen After Receipt

The Food and Nutrition Act of 2008 does not authorize—let alone require—the use of federal funds to replace SNAP benefits stolen after they have been received by recipients. To the contrary, the statutory scheme reflects a deliberate allocation of financial responsibility away from the federal government once benefits have been drawn down by states to be issued to participants. Plaintiffs' APA challenge must fail for that reason.

Statutes governing SNAP have long held states liable for losses concerning the issuance of benefits. The Food and Nutrition Act specifies that "State agenc[ies] shall be strictly liable . . . for any financial losses involved in . . . the issuance of benefits." 7 U.S.C. § 2016(e). That statute derives from the language Congress introduced in 1977 making states "responsible . . . for any financial losses" related to the "issuance of coupons" (JA 93), mirrors language Congress introduced in 1981 (JA 131 ("shall be strictly liable . . . for any financial losses involved in the acceptance, storage and issuance of coupons"), and is consistent with regulations FNS implemented as early as 1991 (JA 207, 218-19). The Food and Nutrition Act's "strictly liable"

20

language makes clear that federal funds are not a backstop for all losses associated with the program. Instead, Congress chose to limit federal liability and assign responsibility for certain losses—including those occurring after issuance—to state agencies. In short, Congress has long treated post-issuance losses, which necessarily include those losses that occur after a participant receives their benefits, as outside the scope of federally reimbursable benefits. This allocation is central to the program's structure as a federally funded but state-administered system.[2]

That § 2016(e) generally precludes the use of federal funds to replace skimmed benefits is underscored by Congress's 2023 Consolidated Appropriations Act, which created a temporary and express authorization for replacement of benefits lost through skimming. In doing so, Congress determined that it was necessary to specify that the particular replacements the Act contemplated "shall not be regarded as losses for the purpose of section 7(e) of the Food and Nutrition Act." (JA 504). In other words, Congress understood that replacement of skimmed benefits would otherwise be prohibited by § 2016(e), and that it was required to make a special exception for the limited replacement

———————

[2] The statutory scheme does permit states to use state funds for replacement issuances, as some do. *See, e.g.*, *Ortega v. Johnson*, 57 Cal. App. 5th 552, 558, 570 (Cal. App. 2020) ("states may issue additional benefits . . . to supplement their residents' federal SNAP benefits"; requiring replacement of benefits "lost through electronic theft").

21

benefits it was authorizing to ensure they were permitted under the law. That carve-out would have been unnecessary if the statute already permitted or required such replacement. The most natural and obvious inference is that, absent this temporary authorization, Congress believed federal funds could not be used for that purpose.

Indeed, more broadly, the fact that Congress was obliged to provide for limited benefits replacement in the 2023 Act, and that it did so without requiring FNS to make wholesale changes to its position on replacement, reflects Congress's understanding of the general and longstanding limitations imposed on the replacement of benefits. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) ("'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress'" (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 (1974))); *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 114 (2d Cir. 2017) (noting the "venerable canon of construction that Congress is presumed to legislate with familiarity of the legal backdrop for its legislation"). The 2023 enactment confirms that Congress accepted the limits on replacing benefits that preexisted that law. The 2010 Regulation is consistent with that understanding and with the remainder of the Food and Nutrition Act, and accordingly was not "contrary to law."

22

### C. The 2010 Regulation is "Similar" to the Regulations Governing the Paper Coupon Regime

In effectuating the transition from paper coupons to electronic benefits, Congress in 1996 and again in 2008 required the USDA to have regulations regarding the replacement of benefits that are "similar to the regulations in effect for a paper-based" system. (JA 305, 361); 7 U.S.C. § 2016(h)(7). As the district court held, the USDA complied with that mandate in promulgating the 2010 Regulation.

#### 1. The Regulation Comports with the Plain, Ordinary Meaning of the Statute

When interpreting a statute, a court should first analyze the plain meaning of the text. *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000). And when a term is not specifically defined, the court turns to "the ordinary, common-sense meaning of the words." *Id.*; *accord USPS v. Konan*, 146 S. Ct. 736, 742 (2026) ("Absent a reason to think otherwise, [courts] interpret statutory terms according to the ordinary meanings they had when they were enacted."). If the meaning is plain, the inquiry ends there. *Daniel v. American Board of Emergency Medicine*, 428 F.3d 408, 423 (2d Cir. 2005).

The ordinary, plain meaning of the word "similar" —now and in 1996, when the PWRORA was enacted— is "[r]elated in appearance or nature; *alike though not identical*." American Heritage Dictionary of the English Language (3d ed. 1996) (emphasis added); *accord* American Heritage Dictionary of the English

23

Language (5th ed. 2022) ("[h]aving a resemblance in appearance or nature; alike though not identical"). As the district court correctly held, Congress's use of the term "similar" thus reflects its intention that the regulations governing the EBT system be related in substance or essentials to the prior regime governing the coupon system, sharing enough "characteristics in common" to be alike but not necessarily identical. (SPA 13). But contrary to plaintiffs' argument, nothing in the statutory text suggests Congress required the USDA to replicate the precise policy justifications or technological assumptions underlying the paper coupon regime. Rather, Congress's choice of the flexible term "similar"—instead of "identical" or "the same as" —reflects an intent to allow adaptation across materially different systems.

Further, the similarity requirement must be considered in the context of the statute's balance between two competing concerns: providing nutritional assistance to low-income households and safeguarding the program against fraud and financial exposure. Congress struck that balance, in part, by distinguishing between losses that occur before benefits are received, which may warrant replacement by the administering states, and those that occur after receipt, which are treated as the responsibility of recipients. Both the paper coupon system and the EBT regime reflect the same principle of continuity: benefits are not replaced once they have been received by the recipient. In that core respect, then, the 2010 Regulation is "similar" to its predecessors and satisfies the statutory mandate.

24

Moreover, the similarity requirement must be read against the background of § 2016(e)'s provision making states solely responsible for financial losses except those resulting from mailing. Because that provision prohibits the use of federal funds to replace skimmed benefits, the 2010 Regulation's continuation of that prohibition makes it "similar" to prior regulations, and therefore consistent with the language of 7 U.S.C. § 2016(h). That essential statutory and regulatory framework governing the replacement of benefits has remained consistent throughout the life of the SNAP and food-stamp programs. States have principally been liable for losses relating to the issuance of benefits. (JA 93, 133, 207, 357); 7 U.S.C. § 2016(e). The regulation in place before the transition to EBT cards permitted states to replace paper coupons that "were destroyed in a household misfortune." 7 C.F.R. § 274.6(a)(1)(ii) (1989). The current version of § 274.6 likewise permits "replacement issuances" where "food purchased with Program benefits was destroyed in a household misfortune." 7 C.F.R. § 274.6(a)(1). And in much the same way the prior version of the regulation required states to replace coupons that were "not received in the mail," "stolen from the mail," or "improperly manufactured," 7 C.F.R. § 274.6(a)(1)(ii), (a)(2) (1989), the current version of the regulation requires states to replace EBT cards that are "lost, stolen or damaged." 7 C.F.R. § 274.6(b).

Benefits lost or stolen after receipt have never been subject to replacement. (JA 114 ("The concept of replacing welfare benefits which have been lost or stolen after they have been received by the participant [is] not common in Federal assistance programs.")). Since

25

1992, the regulations have provided that "replacement benefits [issued] to a household's account due to unauthorized use of the benefits in a household's account" constituted over-issuances for which states are strictly liable. (JA 217); *see* 7 C.F.R. § 276.2(b)(7). The 2010 regulation now in effect is entirely consistent with that rule.

### 2. Section 2016(h)(7) Does Not Require the USDA to Replicate the "Why" and "How" of the Paper Coupon Regime

Instead of looking to the ordinary, plain meaning of the word "similar," plaintiffs rest their arguments on an overbroad interpretation of the word based on constitutional cases that are irrelevant here. They insist that "similar" regimes "must be alike in all 'relevant' or 'material' aspects and must share both a comparable purpose (the 'why') and the allocation of burdens (the 'how')" based on case law arising from entirely different contexts. (Brief for Plaintiffs-Appellants ("Br.") 29). That definition imposes a far greater burden than Congress intended and distorts the ordinary meaning beyond recognition.

The cases plaintiffs cite explain why. In *New York State Rifle & Pistol Ass'n v. Bruen,* the Supreme Court described its process of "analogical reasoning" as determining whether two things are "relevantly similar." 597 U.S. 1, 28-29 (2022) (quotation marks omitted). But "because everything is similar in infinite ways to everything else, one needs some metric enabling the analogizer to assess which similarities are important and which are not." *Id.* (quotation marks and citations

26

omitted). In the context of determining if firearm regulations are "relevantly similar" to historical predecessors under the Court's Second Amendment jurisprudence, "how and why the regulations burden a law-abiding citizen's right to armed self-defense" must be considered, as established in the Court's older precedents. *Id.* But nothing in *Bruen* suggests, as plaintiffs would have it, that a "how" and "why" test must govern any other "similarity" analysis. To the contrary, "analogical reasoning . . . is [not] a regulatory straight-jacket [sic]," and does not require a "twin" or a "dead ringer" for two things to be "similar." *Id.* at 30 (emphasis omitted).[3] In much the same way, context mattered in *Hu v. City of New York*, where this Court specified that under a "similarity standard" created by case law, two sets of circumstances "need not . . . be identical"; what matters is that the plaintiffs at issue must show they are "similarly situated in all material respects." 927 F.3d 81, 96 (2d Cir. 2019) (quotation marks omitted). "Similarity," materiality, and relevance necessarily depend on context.[4]

_____

[3] Plaintiffs cite *United States v. Daniels* (Br. 30, 32), but that case does no more than apply *Bruen*'s "relevantly similar" framework. 124 F.4th 967, 972-73 (5th Cir. 2025).

[4] In *Northcross v. Board of Education of Memphis City Schools*, the Court observed that similarly worded statutes should be interpreted similarly, particularly when they share a "raison d'etre." 412 U.S. 427, 428

27

As set forth above, the statutory command that new regulations be "similar" to their predecessors has been satisfied by the 2010 Regulation. In *Bruen*'s terminology, what is "relevantly similar" is the history of replacement benefits—the facts that states are typically strictly liable for losses involved in benefit issuance, that in other similar programs benefits are not replaced once received by the beneficiary, and that they share exceptions for events like "household misfortune." In the broader picture, § 2016(h) instructs the USDA to ensure continuity in program rules during a transition from one delivery system to another— the word "similar" advances that goal, but what is "relevant" or "material" depends on that context. That other factors have been deemed to contribute to "similarity" in other contexts does not affect the analysis here. *See Bruen*, 597 U.S. at 29 ("[A] green truck and a green hat are relevantly similar if one's metric is 'things that are green.' They are not relevantly similar if the applicable metric is 'things you can wear.'" (citation omitted)).

In sum, § 2016(h)(7) does not require courts to determine whether two regulatory regimes are "similar" in the same sense that other items may be similar. Rather, it is a delegation provision governing agency implementation during a technological transition. In this context, "similar" does not require identity of rationale or mechanism. Because the 2010 Regulation preserves the central features of the prior regime,

————————

(1973) (cited in Br. 30). That anodyne observation provides no support for plaintiffs' arguments here.

28

including the distinction between pre- and post-receipt losses and the limits on replacement, it satisfies the statute.

### 3. Plaintiffs' Argument About Similarity Is Not Rooted in the Statutory Scheme

More specifically, plaintiffs' argument that the two versions of the regulation are not "similar" hinges on their attempt to conflate skimmed benefits with coupons that were "not received" or "stolen from the mail." (Br. 37). They contend that the central feature of rules governing replacement of paper coupons was that the responsibility for benefit loss should lie with the party in the best position to protect against it—*i.e.*, the party with control over the benefits at the time of the loss. But that argument depends on a concept of "control" that finds no support in the statutory or regulatory scheme.

Plaintiffs claim that SNAP participants do not "receive" their benefits until they access them electronically at a point of sale by swiping their EBT card, entering their PIN, and completing their purchase. (Br. 13). Under this theory, a SNAP participant never controls their benefits, because EBT transactions involve the near-instantaneous transmission of funds from "a central database" to "the retailer's bank account." (Br. 13). If participants never have control, then the use of federal funds to replace all lost or stolen benefits would be required, regardless of when or how they were lost or stolen. (Br. 37). That outcome would not be "similar," 7 U.S.C. § 2016(h)(7), to any prior

29

versions of the regulations, none of which allowed for wholesale benefits replacement using federal funds.

In contrast, the 2010 Regulation is "similar" to the regime governing paper coupons. The benefits represented by paper coupons could only be presented and redeemed at "retail food stores" (JA 73-75 at Secs. 9, 10), much like present-day participants use their EBT cards to utilize their benefits at the point of sale. Under the paper coupon system, once participants received those coupons, however, they were responsible for them and generally could not receive replacements. (JA 114 ("a recipient should be responsible for coupons once the recipient has the coupons")). The present treatment of EBT cards is essentially the same: although the current regulation allows for replacement of the physical cards, it nonetheless provides that benefits themselves are not replaceable until after the recipient reports the card lost or stolen to the state agency. 7 C.F.R. § 274.6(b)(2) ("Once a household reports that their EBT card has been lost or stolen, the State agency shall assume liability for benefits subsequently drawn from the account and replace any lost or stolen benefits to the household."); *accord* 56 Fed. Reg. at 65,130 ("[t]he State agency remains responsible for issuance losses in an EBT system the same as it is in a coupon issuance system"). An electronic system undoubtedly presents issues that did not arise under the paper coupon system—in some ways more susceptible to theft (e.g., through skimming), in other ways less so (because benefits can be canceled and reissued if a card is stolen). The agency reasonably adapted its rules to accommodate the changing technology, in a manner that made them similar in

30

relevant ways. As the district court correctly held, the 2010 Regulation was therefore consistent with the statutory command, and must be upheld.

## POINT II

## The 2010 Regulation Is Not Arbitrary and Capricious

### A. The USDA Properly Considered the Pertinent Issues

The district court properly concluded that the 2010 Regulation is not arbitrary and capricious on the ground that the USDA failed to consider the problem of skimming.

Review under the APA's "arbitrary and capricious" standard is "narrow and particularly deferential," requiring the agency to demonstrate only that it "has considered the evidence, examined the relevant factors, and spelled out a satisfactory rationale for its action including the demonstration of a reasoned connection between the facts it found and the choice it made." *Environmental Defense v. EPA*, 369 F.3d 193, 201 (2d Cir. 2004); *accord Prometheus Radio*, 592 U.S. at 423. In reviewing agency action under this standard, "a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio*, 592 U.S. at 423. "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* But while an agency's action can be arbitrary and capricious if it entirely fails to consider an important aspect of a problem before it,

31

*Safe Haven Home Care, Inc. v. HHS*, 130 F.4th 305, 323 (2d Cir. 2025), a reviewing court should not "lightly" reach the conclusion that the agency "overlooked something important," *New York v. DOJ*, 951 F.3d 84, 122 (2d Cir. 2020); *accord Islander East Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 151 (2d Cir. 2008) (approvingly citing *Patterson v. Caterpillar, Inc.*, 70 F.3d 503, 505 (7th Cir. 1995) (court "must be very confident that the decisionmaker overlooked something important")).

The record here demonstrates that the USDA considered all the necessary aspects of the issues before it. In transitioning from paper coupons to an electronic benefits system, the USDA addressed the security of the EBT infrastructure, including how benefits would be accessed, transmitted, and protected during transactions. Nothing more is required.

As the district court explained, the USDA implemented detailed regulations focused on theft of EBT cards and the security of the EBT system. (SPA 16). Specifically, the 2010 Regulation and other regulations issued at the same time required state agencies to permit households to select personal identification numbers ("PINs") for their EBT cards; to develop systems to verify PINs at issuance terminals or at the point of sale and to ensure EBT systems met performance and technical standards for system security; to replace lost or stolen EBT cards; to place an immediate hold on accounts as soon as notice regarding the need for card or PIN replacement was received; and to assume liability for benefits drawn from an EBT account and to replace misappropriated benefits after

32

recipients reported their EBT card had been stolen. (SPA 10; JA 230).

Plaintiffs argue that the provisions cited by the district court do not address the risk of skimming or other forms of cyberfraud. But the USDA regulations in fact detailed measures that the states should take to protect the integrity of EBT transactions and the transmission of transaction data and issuance information from point-of-sale terminals to data processing centers. (JA 252 (regulations on verifying the identity of authorized households or authorized household representatives at issuance terminals or point of sale), JA 255 (regulations concerning EBT system and point-of-sale compliance with performance and technical standards in the areas of system security), JA 255 (regulations concerning communication control including the transmission of transaction data and issuance information from point-of-sale terminals to work stations and terminals at the data processing center), JA 256 (regulation on PIN encryption, data security during electronic transmission, and security components to address EBT system vulnerability to theft and unauthorized use, erroneous posting of issuances to household accounts, and capability to monitor systemic abuses at point-of-sale terminals)).

Plaintiffs incorrectly insist that skimming must be treated as a categorically distinct problem. (Br. 39). But skimming is simply one example of a broader class of risks inherent in electronic transactions. Skimming involves capturing card and PIN information during a point-of-sale transaction and using that information to access benefits already stored in an electronic account.

33

Those risks arise directly from features that the USDA considered and addressed: use of point-of-sale devices for benefit access; electronic transmission of transaction data; and centralized storage of benefits. The fact that skimming involves particular technologies (e.g., card readers or Bluetooth devices) does not transform it into a distinct regulatory problem—it remains a form of unauthorized access to benefits. The APA does not require the agency to separately identify and analyze each mechanism through which such unauthorized access might occur.

Plaintiffs argue that skimming and other forms of cybertheft were "well-known issues at the time of the 2010 Regulation." (Br. 42-43). But that assertion is unsupported: plaintiffs do not point to any evidence in the administrative record demonstrating that skimming of EBT benefits was an issue before the USDA at the time it promulgated the 2010 Regulation.

Plaintiffs also argue that even if the USDA considered EBT system security, it failed to consider the distinct issue of skimming "in the context of *benefit replacement*." (Br. 40 (emphasis in original)). But system security and benefit replacement are distinct: the USDA separately considered security measures to address how to prevent unauthorized access, as well as replacement rules determining who bears the loss when such access occurs. The APA does not require the agency to revisit the second issue—allocation of losses—for every permutation of theft that could arise from a lapse in system security. In other words, it was perfectly permissible for the USDA to treat all forms of post-receipt losses alike, regardless of whether they

34

arise from physical theft, fraudulent transactions, or electronic methods such as skimming. Once the USDA reasonably determined that post-receipt losses are not subject to replacement, it was not arbitrary or capricious to allow that determination to carry over regardless of the specific security vulnerability that gave rise to the loss.

Plaintiffs' theory would impose an untenable burden on agency rulemaking. It would effectively require the USDA to anticipate and separately analyze every future technological method of fraud—whether skimming, phishing, or other forms of cybercrime—and to then reevaluate its benefit replacement policy and provide a new, mechanism-specific justification. The APA imposes no requirement on an agency to revisit settled policy judgments each time a new factual variation arises.

In sum, the USDA did not ignore the risk of unauthorized access to SNAP benefits. It addressed that risk at the appropriate level of generality—by considering the security of the EBT system and adopting a consistent rule governing post-receipt losses. The APA required nothing more.

## B. The District Court Did Not Abuse Its Discretion in Declining to Consider Plaintiffs' Extra-Record Evidence Regarding Skimming

Plaintiffs argue that the district court abused its discretion by excluding extra-record evidence about skimming and other types of cyberfraud the USDA allegedly failed to consider. (Br. 45). However, they

35

have failed to assert a proper basis for allowing that evidence to come before the district court.

"[I]n reviewing agency action" under the APA, "a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Biden v. Texas*, 597 U.S. 785, 811 (2022) (quotation marks omitted). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *accord Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). Thus, "[g]enerally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *National Audubon Society v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997). "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Lorion*, 470 U.S. at 744; *accord Calcutt v. FDIC*, 598 U.S. 623, 628-29 (2023). A district court is only permitted to consider extra-record evidence "when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers or where the absence of formal administrative findings makes such investigation

36

necessary in order to determine the reasons for the agency's choice." *Hoffman*, 132 F.3d at 14; *accord Biden*, 597 U.S. at 811-12; *American Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) ("unusual circumstances" that may justify extra-record evidence include a showing that the agency deliberately or negligently excluded documents; that background information is needed to determine if agency considered relevant factors; or the agency failed to explain its action so as to frustrate review).

Plaintiffs do not identify—let alone satisfy—any of the established exceptions to the record rule. Their principal argument is that their extra-record evidence demonstrates that the USDA failed to consider skimming and cyberfraud. But that argument simply repackages their merits claim and does not justify supplementation of the record—as the Supreme Court has explained, such a failure, if true, would justify "remand . . . for additional investigation or explanation" rather than admission of extra-record evidence in the court proceedings. *Lorion*, 470 U.S. at 744; *accord Camp*, 411 U.S. at 142-43 (if "there was such failure to explain administrative action as to frustrate effective judicial review, the remedy was not to hold a *de novo* hearing but . . . to obtain from the agency . . . such additional explanation of the reasons for the agency decision as may prove necessary"). Thus, plaintiffs cannot obtain extra-record review merely by asserting that the agency failed to consider certain evidence or to address a certain issue. *See Camp*, 411 U.S. at 142 (rejecting supplementation where plaintiffs sought to introduce new evidence to challenge the agency's conclusions).

37

And in any event, as explained above, skimming and cybertheft are forms of benefit theft arising from a gap in security measures, which the USDA did consider. That it did not regulate on the issue of skimming *per se*, or refer to benefit theft in an electronic system as "cyberfraud," is of no moment because the agency did in fact address system and data security. Thus, this is not a case in which the agency failed to consider relevant factors: rather, plaintiffs simply disagree with how the USDA framed the issue. Given these principles, the district court's decision to decline to consider plaintiffs' extra-record evidence was entirely proper.

Further, plaintiffs' assertion that "had the District Court considered the excluded materials, it would have seen that skimming, as a phenomenon independent from other forms of theft, was widespread and known at the time of the 2010 Regulation and therefore should have been considered in the Regulation's promulgation" (Br. 46) is mistaken. The district court did look at plaintiffs' extra-record evidence concerning the prevalence of skimming and concluded that it "would not carry the day." (SPA 17 n.8). Rather, the court held that, at best, the articles and DOJ press release that plaintiffs collected indicated that, at the time the 2010 Regulation was adopted, there had been a few reported incidents of skimming, not that skimming was a pervasive problem that the USDA should have considered. (SPA 17 n.8). Moreover, none of the documents plaintiffs submitted addressed skimming with respect to SNAP benefits. (JA 596-604, 651-59, 756-78).

38

Accordingly, the district court acted well within its discretion in declining to consider plaintiffs' extra-record evidence concerning the prevalence of skimming and also correctly reasoned that such evidence was unpersuasive.

## C. The USDA Engaged in Reasoned Decisionmaking

In addition, the record demonstrates that the USDA engaged in reasoned decisionmaking when it adopted the 2010 Regulation.

The agency's reasoning is evident and rational. As the administrative record reflects, the USDA's approach to benefit replacement has long been guided by a balance between providing assistance to households experiencing hardship and protecting program integrity and limiting opportunities for fraud and abuse. The 2010 Regulation reflects the same balance. It allows replacement in defined circumstances—such as household misfortune or loss of access to benefits through stolen or damaged cards—while generally declining to extend replacement to losses occurring after benefits have been received. That policy judgment is well within the USDA's discretion. The APA does not require agencies to eliminate all hardship or to adopt the most generous possible policy; it requires only that the agency articulate a rational connection between the facts found and the choice made. *Prometheus Radio*, 592 U.S. at 423; *State Farm*, 463 U.S. at 43. The USDA satisfied that standard.

Plaintiffs' contrary argument depends on the assumption that the 2010 Regulation reflects a novel or

39

unexplained departure from prior policy. (Br. 47-49). But that is incorrect. As explained above, the USDA has long drawn a clear line between pre-receipt losses, which may be replaced in limited circumstances, and post-receipt losses, which are not subject to replacement. That distinction predates the EBT system and was firmly established under the paper coupon regime. (JA 114 (explaining that "a recipient should be responsible for coupons once the recipient has the coupons")). The 2010 Regulation simply carried forward that longstanding policy into the EBT context. Because the USDA did not alter the governing rule regarding post-receipt losses, there is no need for the agency to explain a shift in policy that never occurred.

More broadly, plaintiffs contend that the USDA failed to provide a reasoned explanation significantly addressing skimming. But that argument misstates the agency's obligation under the APA. An agency must explain the rule it adopts, not every potential application of that rule. *See Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968) ("We do not expect the agency to discuss every item of fact or opinion included in the submissions made to it in informal rule making," so long as the statement explains the "major issues of policy" and "why the agency reacted to them as it did"); *Center for Auto Safety v. Peck*, 751 F.2d 1336, 1355 n.15 (D.C. Cir. 1985) ("An agency need not address every conceivable issue or alternative, no matter how remote or insignificant."). Here, the USDA adopted a rule governing a variety of types of post-receipt losses. That rule applies regardless of whether benefits are lost through physical theft, fraudulent transactions, or electronic methods such as

40

skimming. The USDA was not required to provide a separate, mechanism-specific explanation for each type of theft.

At bottom, plaintiffs' argument is not that the USDA failed to engage in reasoned decisionmaking, but that it should have reached a different policy outcome in light of evolving risks. But the APA does not permit a court to "substitute its own policy judgment for that of the agency." *Prometheus Radio*, 592 U.S. at 423. The question is not whether the USDA could have chosen to allow replacement of skimmed benefits, but whether its decision not to do so is rational and consistent with the statute. It plainly is. The USDA reasonably adhered to a longstanding policy governing post-receipt losses and declined to expand federal liability absent congressional authorization. The district court correctly sustained that decision.

## POINT III

### The District Court Properly Held There Is No Separate 2022 Policy Subject to APA Review

#### A. Plaintiffs Failed to Plead a 2022 Policy in the Complaint

The district court properly concluded that plaintiffs failed to timely plead their allegations regarding the purported 2022 policy. (SPA 18).

A party is not entitled to amend its complaint on summary judgment. *See Greenidge v. Allstate Insurance Co.*, 446 F.3d 356, 361 (2d Cir. 2006). Accordingly, where a party attempts to advance new claims during

41

motion practice, courts correctly disregard them. *See, e.g.*, *id.* (declining to reach the merits of an argument raised for the first time in opposition to summary judgment).

The district court properly declined to entertain plaintiffs' new arguments concerning the existence of a purported 2022 policy precluding the use of federal funds to replace skimmed benefits because the complaint failed to allege such a policy. As the district court recognized, the crux of plaintiffs' complaint is that the USDA based its refusal to replace skimmed benefits with federal funds on the 2010 Regulation. (JA 29 (discussing why 2010 Regulation is allegedly contrary to law), JA 36 (explaining that guidance issued in response to 2023 Appropriations Act did not "change the [2010] regulation")). Indeed, the complaint's allegations focused on the USDA's promulgation of the 2010 Regulation and the way in which the regulation allegedly differed from the pre-EBT rules on replacement. (JA 28-29). To the extent that the complaint refers to post-2010 material issued by the USDA, it characterizes that material as "guidance" that "is consistent with the 2010 Regulation, which the Plaintiffs claim is 'unlawful.'" (SPA 18-19).

As plaintiffs concede, the complaint does not refer to a "2022 Policy" (Br. 50 n.11), nor does it identify any such policy as the basis for an APA challenge. On appeal, plaintiffs argue that they pleaded the existence of a 2022 policy separate from the 2010 Regulation because their complaint refers to "policies and regulations," supposedly making clear that their lawsuit is not limited to the 2010 Regulation, and describes the

42

agency's decision to "prohibit[ ] replacing stolen SNAP benefits using federal funds." (Br. 50-51). Similarly, plaintiffs maintain that the complaint generally identifies the USDA as the agency responsible, access to SNAP benefits as the impacted rights, and the USDA's policy against replacement of skimmed benefits as the adverse action. (Br. 52). But those broad and vague references fall far short of pleading the existence of an agency action subject to APA review.

Plaintiffs point to allegations concerning a guidance memorandum issued by the USDA in connection with Congress's 2023 Consolidated Appropriations Act. (Br. 51 (citing JA 36, Complaint ¶ 64)). But the complaint does not characterize that document as final agency action subject to APA review; to the contrary, it faults the memorandum for failing to "change the [2010 R]egulation . . . , which limits States' ability to replace benefits." (JA 36, Complaint ¶ 64). Plaintiffs also cite a General Information System Message issued by OTDA as announcing a USDA policy. (Br. 51 (citing JA 37, Complaint ¶ 68)). But as the district court correctly held, there is no support for the proposition that actions taken by state agencies can be attributed to the federal government for purposes of APA review, and such an interpretation would make little sense since the APA's requirement of a final agency action necessarily presumes that the agency itself, and not some other entity, took the challenged action. While plaintiffs insist that the state documents "confirm the existence of the challenged federal policy" (Br. 54), they remain unable to identify what that

43

policy is and whether and how it was adopted by the USDA.[5]

Accordingly, the district court did not abuse its discretion in concluding that plaintiffs failed to plead the existence of a 2022 policy.

## B. The District Court Correctly Held That the 2022 Policy Does Not Constitute Final Agency Action

Even if plaintiffs had adequately pleaded the existence of a "2022 Policy," the district court correctly held that such a policy is not subject to review under the APA because it does not constitute final agency action. (SPA 20). The APA authorizes judicial review only of "final agency action." 5 U.S.C. § 704. To qualify as agency action, the challenged conduct must be an

———

[5] Plaintiffs rely on but mischaracterize *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525 (D.C. Cir. 1990); (Br. 54-55). The letters in question there were issued by a high-level agency employee, not a separate entity of a separate sovereign. *Id.* at 1530. They confirmed a discrete agency action, declining to initiate a regulatory program as allegedly required by statute. *Id.* at 1528-31. And while plaintiffs note that the letters cautioned that they represented only the official's own views, the court rejected that contention: "there can be little doubt that in this instance, [the official] was speaking for the EPA. . . . [W]e have no reason to question his authority to speak for the EPA." *Id.* at 1531-32.

44

"agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see* 5 U.S.C. § 701(b)(2) (adopting § 551's definition of "agency action" for §§ 701-706). The mere "continuing . . . operations of the [agency] in reviewing" its own procedures, infrastructure, and decisionmaking is not "an identifiable 'agency action.'" *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890 (1990). "The limitation to discrete agency action precludes [a] broad programmatic attack" on agency conduct. *Norton v. South Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). And to be reviewable by courts under the APA, an agency action must be "final." 5 U.S.C. § 704. For an agency action to be final, first, it " 'must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature' "; second, it " 'must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

Plaintiffs cannot point to any agency action in 2022 that meets these requirements. They have failed to identify a "*discrete* agency action," *Norton*, 542 U.S. at 64, instead alleging an amalgamation of state agency communications regarding prohibitions on reimbursement of benefits lost to skimming and two federal memorandums that do not themselves announce any binding rule (SPA 17, 20-21). The APA requires a discrete, identifiable act by the agency itself, not a collection of documents assembled by litigants. Nothing about what plaintiffs identify is akin to the type of

45

"rule" or "order" or similar decision that is necessary for an agency action to be challengeable under the APA, 5 U.S.C. § 551(13); rather, it is "the common business of managing government programs" that is not subject to judicial review, *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13, 19-20 (D.C. Cir. 2006); *accord National Wildlife Federation*, 497 U.S. at 890. Nor can plaintiffs satisfy the finality requirement, as nothing they allege represents the consummation of the USDA's decisionmaking process regarding benefit replacement.

Further, plaintiffs' reliance on statements by New York State agencies is independently fatal to their claim. The APA applies only to actions of the federal agency whose conduct is challenged. State agencies are not agents of the USDA for purposes of creating federal policy subject to APA review. The district court correctly held that "Plaintiffs offer no support for their position that actions taken by State agencies can be attributed to Defendants for purposes of APA review." (SPA 20-21). On appeal, plaintiffs fail to cite any law or justification for disturbing that conclusion. Allowing state communications to constitute federal agency action would fundamentally distort the APA and blur the line between federal and state authority in a cooperative program like SNAP.

Additionally, none of the materials cited by plaintiffs reflect a new or completed decisionmaking process by the USDA. The non-replacement of skimmed benefits with federal funds does not arise from a newly adopted policy. It follows directly from the SNAP statute, including 7 U.S.C. § 2016(e), and the longstanding

46

regulatory framework, including the 2010 Regulation. Thus, the materials that plaintiffs identify do not lead to "legal consequences"; they simply reflect the existing legal landscape. *Bennett*, 520 U.S. at 178. Courts routinely reject attempts to treat guidance or explanatory materials as final agency action where they merely restate or apply existing rules. *See, e.g., Independent Equipment Dealers Ass'n v. EPA*, 372 F.3d 420, 427-28 (D.C. Cir. 2004) (EPA letter was not reviewable final agency action where it "merely restated" the agency's longstanding interpretation, "neither announced a new interpretation" nor changed the regulations, was "purely informational," and "left the world just as it found it"); *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 431-33 (4th Cir. 2010) (agency document was not final agency action where it sought only to "restate or report what already exists" in statutes, regulations, and rulings and did not alter the legal regime).

Accordingly, the district court correctly concluded that the only identifiable, reviewable agency action concerning benefit replacement is the 2010 Regulation. That regulation reflects the USDA's considered policy judgment and is the proper subject of APA review. The district court's rejection of a challenge to a supposedly separate "2022 Policy" should be affirmed.

47

## CONCLUSION

**The judgment of the district court should be affirmed.**

Dated:     New York, New York
          May 11, 2026

              Respectfully submitted,

              JAY CLAYTON,
              *United States Attorney for the*
              *Southern District of New York,*
              *Attorney for Defendants-Appellees.*

TARA SCHWARTZ,
BENJAMIN H. TORRANCE,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 10,964 words in this brief.

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York*

By: TARA SCHWARTZ,
*Assistant United States Attorney*